# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00626-CV

---

### A. S. and P. S., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-20-000252,
### THE HONORABLE CLEVE WESTON DOTY, JUDGE PRESIDING

---

## O P I N I O N

Appellants A.S. (Mother) and P.S. (Father) appeal from the district court's order appointing P.T.S. (Maternal Grandmother) the nonparent sole managing conservator of sixteen-year-old M.R. (Son 2); ten-year-old R.S. (Son 3); and six-year-old J.S. (Son 4).[1] Mother and Father each bring a single issue on appeal challenging the sufficiency of the evidence supporting the district court's findings that appointing Mother and Father as managing conservators would significantly impair the children's physical health or emotional development. We will reverse the district court's order and remand for a new trial.

---

[1] Mother has an older child (Son 1) who was initially a child subject to this suit but who became an adult before the case went to trial. Son 2 is Mother's child with another man, while Son 3 and Son 4 are Mother's children with Father. For the children's privacy, we refer to them and their parents by their initials and by their familial relationships to each other, and we refer to the children's approximate ages at the time of trial rather than their actual birth dates. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

## BACKGROUND

This case began on December 30, 2019, when the Texas Department of Family and Protective Services (the Department) received a report that Mother had taken Son 4 to a hospital, suspecting that he might have been sexually abused by his uncle. According to the Department's removal affidavit,[2] the alleged abuse was ultimately "ruled out" by the Department. However, during the investigation, the Department developed concerns that Mother and Father "display a pattern of instability where they are unable to financially provide for their children and provide appropriate housing." These concerns were based on Mother's and Father's "history [of] drug and alcohol abuse," Mother's previous history with the Department,[3] Mother and Father "continu[ing] to reconcile" and "abuse drugs and alcohol which in turn causes an unstable living environment for the children," and Mother and Father not cooperating with the Department or law enforcement during the investigation. Additionally, the Department was concerned about Mother's mental health.

According to the initial status report filed with the district court, on January 10, 2020, Mother tested positive for marijuana and alcohol and Father tested positive for alcohol and negative for drugs. The children were subsequently removed from Mother and Father. To

---

[2] A copy of the removal affidavit was not admitted into evidence during trial, and because it was not admitted, we cannot consider the allegations contained within the affidavit in our review of the evidence. *See Tschirhart v. Tschirhart*, 876 S.W.2d 507, 508 (Tex. App.—Austin 1994, no writ) (explaining that although "a court may take judicial notice of its own records," it "may not, however, take judicial notice of the truth of allegations in its records"). We refer to the affidavit only to the extent necessary to understand the background of this case.

[3] According to the removal affidavit, between 2015 and 2018, there were multiple reports of neglectful supervision of the children by Mother. Two of these reports were "ruled out" and two were "administratively closed due to the allegations being refuted by a credible source." One report, based on Mother's use of marijuana, was found "reason to believe." Again, however, the removal affidavit was not admitted into evidence, and no witness testified about this history.

obtain the return of the children, Mother and Father were required to participate in various court-ordered services, including drug testing.

Although the Department had initially sought termination of Mother's and Father's parental rights, by the time of trial, the Department was instead seeking only the appointment of Maternal Grandmother as permanent managing conservator. During the bench trial, four witnesses testified: Phoebe Sosa, a Department conservatorship worker assigned to the case; Garret Oliveira, the CASA volunteer assigned to the case; Mother; and Father. Maternal Grandmother did not testify, and no documentary evidence or other exhibits were admitted.

Sosa, who was assigned to the case in September 2021, testified that when the case began in February 2020, the Department had concerns regarding Mother's "instability," Mother's and Father's drug use, and "domestic violence between the two of them at that time." Sosa did not elaborate on the reasons for these concerns. Sosa recounted that at the beginning of the case, Mother and Father were ordered to complete a psychological assessment and an Outreach, Screening, Assessment, and Referral (OSAR), take parenting classes, and submit to random drug testing. During the first seven months of the case, Mother and Father each submitted two out of seventeen requested drug tests, completed their psychological assessments, and "started engaging in some therapy."

Sosa testified that in September 2020, "[d]ue to lack of engagement, especially with the drug testing, and not fully getting involved with the services," the Department requested and obtained temporary managing conservatorship of the children, who were then "officially placed" with Maternal Grandmother, even though the children had been living with her since the case began. Mother and Father were ordered to continue drug testing and follow all recommendations from their psychological assessments, which included individual therapy and

3

parenting classes, couples' counseling, and an OSAR. Mother was also ordered "to complete a psychiatric evaluation and to get involved in the recovery community."

Mother and Father submitted to the drug tests "on occasion"—Sosa "estimate[d] that they were asked to drug test maybe around 56 times. And out of that number I believe they went maybe four to five times." According to Sosa, at the time of trial in August 2022, neither Mother nor Father had taken a drug test in over a year, despite the Department requesting that they do so "[b]etween 27 and 30 times" during that year. Father's last known drug test,[4] in May 2021, was positive for cocaine, and the Department "had concerns of cocaine use throughout this case" for Father and at the beginning of the case for Mother. However, Mother never tested positive for cocaine, although Sosa testified that her "last couple of drug tests" were positive for marijuana.

Regarding the other services, Mother completed individual therapy, parenting classes, the psychiatric evaluation, and a 60-hour Intensive Outpatient Program (IOP). She did not complete couples' counseling. Father completed the psychological evaluation and one of two requested OSARs. He did not complete parenting classes, individual therapy, and couples' counseling.

Throughout the case, Mother had supervised visitation with the children. The visits were to be supervised by Maternal Grandmother, although the Department had concerns that Maternal Grandmother had not supervised all the visits. For Mother to obtain unsupervised visitation, she needed "to complete two consecutive drug tests that were clean in a timely manner," which she admittedly never did.

_____

[4] Sosa testified that she had arranged for Father to take a drug test the week before trial, but she had not received any test results and did not know if Father had actually taken the test.

4

Sosa testified that at the beginning of the case the parents did not have stable housing, although she acknowledged that by the time of trial, they did. Sosa had visited their home in the month before trial and recounted that it was a "very clean" two-bedroom apartment with a living room. Sosa "didn't see any visible safety hazards when [she] was there," and Sosa had confirmed that Mother had an "actual lease" on the apartment for a "full year," through either April or May 2023.

Sosa explained that the Department "didn't have any concerns for like the physical space" of the apartment. Instead, the Department took issue with Mother continuing to reside with Father because of the Department's concern regarding domestic violence. Again, the reasons for this concern were not explained. On cross-examination, Sosa acknowledged that the Department had not received any referrals regarding domestic violence since the case began and that she was not aware of the police responding to any calls of domestic violence at the apartment.

Throughout the case, the children had resided with Maternal Grandmother. Sosa testified that she had visited the children frequently there and spoke with them often regarding their feelings. According to Sosa, the children love their parents, "enjoy spending time with their parents" and "feel safe with their parents," but they "want to be with their grandmother." However, Sosa also testified that Maternal Grandmother "has struggled to maintain financial stability" and that this was an ongoing concern for the Department. Another concern was that the children had repeated absences from school while in Maternal Grandmother's care, although Sosa believed this concern had been addressed to the Department's satisfaction.[5] Sosa explained

---

[5] As a result of these and other issues with Maternal Grandmother, the attorney ad litem for Son 4 expressed opposition at trial to Maternal Grandmother being appointed permanent

5

that the children were "extremely bonded to their family," and the Department did not want to "break up this bond." To help Maternal Grandmother financially, the Department had provided her with "direct financial assistance for rent" and had contacted Casey Family Services, a local community service organization, "to provide support to the family" moving forward. Sosa believed that Maternal Grandmother "does her best to make sure that [the children are] safe, "loves them and she cares for them very deeply," and would not "ever willingly put them in an unsafe situation." She also believed that the children were "very happy" and "feel loved and cared for" in their current placement. Sosa testified that the Department was asking for Maternal Grandmother to be named permanent managing conservator of the children. When asked why she believed that this was in the children's best interest, Sosa testified,

> Again, the family—or the children want to be with their grandmother. They do love her. And unfortunately the concerns that the Department had regarding the parents were not fully alleviated throughout this case. And so because those safety concerns were not alleviated the Department does feel that the best place for the children is with their grandmother.

CASA volunteer Oliveira testified that at the beginning of the case, CASA was concerned with Mother's and Father's "physical and mental safety" and that at the time of trial, Mother and Father had not alleviated those concerns. Oliveira did not elaborate on the nature of these "safety" concerns. Oliveira also testified that CASA had no concerns with the current placement and that he believed keeping the boys together and with family was in their best interest. Oliveira believed that the children were safe, happy, and healthy with Maternal Grandmother. On the other hand, Oliveira acknowledged that CASA had not received any

managing conservator of Son 4 and wanted the case to remain open until more actions could be taken to ensure that Maternal Grandmother would be a safe placement.

6

information that the boys were ever unsafe in Mother's care. Oliveira also acknowledged that he had never observed a visit between Mother and Father and the children, nor had he visited their apartment.

Mother testified that the case began when she was "staying in a shelter and [she] would drop off [Son 4] every day to go to school at [Maternal Grandmother's] house," while Mother went to work as a cashier at a gas station. One day when Mother picked up Son 4, Maternal Grandmother "told [her] some things about [her] oldest brother" that led Mother to suspect that he might have abused Son 4. Mother explained,

> So I confronted my family and this is how everything started. I confronted my family, asked them all what was the right thing to do. And, yes, a parent, as a mom I took [Son 4] to the hospital and this is how everything escalated. I got in bad terms with my family because of the decision—decision that I made of taking my baby to the hospital. And also nobody believed me and I guess that's where they saw me being homeless, the marijuana use, the instability of my household and the kids.

Mother testified that she was asked to complete services because of that situation and that she had completed most of the services. Mother explained that she completed both a psychological and a psychiatric evaluation and was diagnosed with PTSD. However, copies of the evaluations are not before us because they were not admitted into evidence. She completed parenting classes, alcohol and narcotics (ANA) classes, and an intensive outpatient program. Mother also participated in individual therapy, which included a protective parenting class.

Mother acknowledged that she did not submit to most of the drug tests requested by the Department but testified that this was because she felt "frustrated" and "harassed" by the Department. She explained that "even though [she] cooperated" with the Department at the

7

beginning of the case by taking urine tests and testing negative for marijuana,[6] the Department had made the case "more complicated" by requiring hair follicle tests as the case progressed. This caused her to "kind of step[] back" and stop drug testing. Mother admitted that she uses marijuana but testified that this was the "only drug" that she uses. Mother did not "think" she would continue using marijuana if the children were returned to her because she would be spending her free time with them and it would be "a whole different start."

Mother further testified that she had been licensed as an auto-insurance agent since January 2022 and that at the time of trial, she had been at her current job for approximately two months. Mother worked from 9:00 a.m. until 7:00 p.m., six days a week. She currently leased a two-bedroom duplex-style apartment with Father but was "working on [her] credit" so that she "can buy a home" in the future. She described her apartment as a "decent place," with a balcony and "a back yard for the boys." She added that the apartment was in a "really nice area" that was "walking distance to the stores, to the school." If the children were returned to her, Mother planned on having them sleep in the bedrooms while she slept in the living room. Mother acknowledged that the children were happy, healthy, and cared for by Maternal Grandmother, but she believed the children would be happier with her, and she wanted full custody of the children because "God gave [her] those kids and they're [her] responsibility." Mother also wanted to prove to her children, her family, and herself that she was "a good mom."

Father testified that he lived with Mother and had been working at a taco restaurant for five to seven months, while "doing home detailing" jobs after work. Before that, Father was a carpet installer for seven years, and he testified that he had always supported his

---

[6] Mother tested negative for marijuana twice, although not on consecutive tests as required by the Department.

family financially. Regarding his court-ordered services, Father testified that he completed a psychological evaluation, did his OSAR evaluation, and attended four individual therapy sessions. However, Father did not complete the therapy sessions because the sessions required him to attend over the phone during his work hours. Father also did not take classes on nurturing parenting. Father testified initially that he had "never consumed drugs," although he acknowledged on cross-examination that he had used cocaine on the one occasion when he had tested positive for it. Father then testified, "But never again have I consumed drugs." Father testified that his "problem was alcoholism," that he had left his job for two months to attend a rehabilitation facility, that he had been released from the facility the day before trial, and that he was "now more than clean" and "very free" of drugs and alcohol. Father added that his rehabilitation included an aftercare program that he would attend to remain sober.

Mother testified that she and Father had been together for thirteen years, that "[h]e's been around all this time" taking care of the children, cooking for them, exercising with them, "[b]uying them their shoes, their clothes, everything, pay[ing] for the bills, you know. Everything." Mother had observed "a lot of improvement" in Father since the case began and described him as a "hard worker" and her "biggest support[er]." She believed that the children loved both her and Father. Mother added that even her two children who were not Father's biological children "see him as a dad, too."

At the conclusion of trial, the district court stated that "both parents are obviously very capable people" and that "[i]t's unfortunate we are in this situation because we have two parents holding steady jobs and there is a lot of good stuff here." The district court added, "It's commendable that mom brought the kids to—or the younger kid to CPS because of suspected abuse. That's what we want parents to do." The district court added, however, that the failure of

Mother and Father to take the requested drug tests "tells us that you don't want anyone to know what's going on or that you may be on drugs or are still using drugs which then makes this process a lot more challenging."  The district court concluded,

> And that really seems to be the main hold up and issue everybody has with what's going on is the lack of the drug test, the clean drug test which is a serious issue. So we have to take that seriously.  In fact we see every day what happens when folks do mix drugs with child raising.  It does not go well. . . .  So this is a challenging situation.  Parental rights are important so I'm going take this under advisement.

The district court later issued its final decree of conservatorship.  In its order, the district court found that appointing Mother and Father as managing conservators of the children would not be in the children's best interest because doing so would significantly impair the children's physical health or emotional development.  The district court also found that appointing Maternal Grandmother as nonparent sole managing conservator would be in the best interest of the children and accordingly appointed her to that position.  Mother and Father were appointed possessory conservators.  This appeal by each parent followed.

**STANDARD OF REVIEW**

We review conservatorship determinations for abuse of discretion.  *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).  "As conservatorship determinations are 'intensely fact driven,' the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record.'"  *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002); *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin

2002, no pet.)).  "The trial court's judgment will be reversed only when it appears from the record as a whole that the court has abused its discretion."  *Id*. (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)).  "A trial court abuses its discretion when it acts 'without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably.'"  *Id*. (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).

Under an abuse-of-discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error but instead are factors used to determine whether the trial court abused its discretion. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied).  Under this standard, an appellate court considers whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion. *Id*. at 588. "The traditional sufficiency review comes into play with regard to the first question; however, the inquiry does not end there."  *Id*. (citing *Echols*, 85 S.W.3d at 478). "The appellate court then proceeds to determine whether, based on the evidence, the trial court made a reasonable decision, that is, that the court's decision was neither arbitrary nor unreasonable."  *Id*.  A trial court does not abuse its discretion if there is some substantive, probative evidence to support its decision.  *Zeifman*, 212 S.W.3d at 587; *Echols*, 85 S.W.3d at 477.  Evidence is legally sufficient when it would enable reasonable and fair-minded people to reach the verdict under review and is factually insufficient only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Zeifman*, 212 S.W.3d at 588-89.

11

## THE PARENTAL PRESUMPTION

Because we are reviewing a conservatorship determination, we begin by emphasizing the "rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." Tex. Fam. Code § 153.131(b); *see also id*. § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."). Therefore, "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." *Id*. § 153.131(a).

"The presumption that the best interest of a child is served by awarding custody to a natural parent is deeply embedded in Texas law." *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990). The Legislature "codified that presumption by defining the procedure for appointment of a nonparent as managing conservator." *Id*. "Prior to 1987, the [Family Code] provided that '[a] parent shall be appointed managing conservator of the child unless the court finds that appointment of the parent would not be in the best interest of the child.'" *Id*. (quoting former Tex. Fam. Code § 14.01(b)). "In 1987, however, the legislature made clear the paramount importance of the parental presumption by amending the statute" to require a more specific finding that "'appointment of the parent or parents would not be in the best interest of the child *because the appointment would significantly impair the child's physical health or emotional development*.'" *Id*. (quoting former Tex. Fam. Code § 14.01(b) (current version at Tex. Fam. Code 153.131(a) (emphasis added)). "[T]his amendment was viewed as a significant change greatly strengthening the parental presumption:

12

'Thus, while there might be a lot of reasons appointment of a parent would not be in the best interest of the child, only one suffices to rebut the parental preference. This means that the fact that another contesting third party, for example, a grandparent, would be a better custodian of a child is not sufficient to rebut the parental presumption absent this impairment of physical health or emotional development.'"

*Id.* (quoting 89–1 State Bar Section Report—Family Law 27 (J. Sampson ed. 1989)); *see also id.* at 166 n.3 ("'[T]he evidence will have to be rather strong in showing some type of past physical abuse or neglect.'") (quoting Patricia A. Wicoff, *Joint Managing Conservatorship, The New Statute*, State Bar of Texas Advanced Family Law Course P-22 (1987)); *id.* ("'With regard to impairment of emotional development, it would seem that very strong psychological or psychiatric testimony would have to be offered as to the mental health of the parent [who is] being denied conservatorship.'") (quoting Wicoff, *Joint Managing Conservatorship, The New Statute*, State Bar of Texas Advanced Family Law Course P-22).

The statute thus "creates a strong presumption in favor of parental custody and imposes a heavy burden on a nonparent." *Lewelling*, 796 S.W.2d at 167. "It is no longer adequate to offer evidence that the nonparent would be a better custodian of the child." *Id.* Instead, "the nonparent must affirmatively prove by a preponderance of the evidence that appointment of the parent as managing conservator would *significantly impair* the child, either physically or emotionally." *Id.* (emphasis added). "This statute thus requires the nonparent to offer evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Id.*; *see also In re F.N.*, 579 S.W.3d 74, 78 (Tex. 2019) (op. denying pet.) ("The statute creates a parental preference by placing the burden on the non-parent seeking conservatorship to establish that the

parent's appointment would result in significant impairment to the child. We have indicated that such proof should include the acts or omissions of the parent demonstrating that result.").

"This link between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation of possible harm." *In re De La Pena*, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.). "Instead, the evidence must support the logical inference that some specific, identifiable behavior or conduct of the parent will probably harm the child." *In re B.B.M.*, 291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied). The harm must be actual rather than "theoretical in nature." *Id*. at 468. "A mere potential threat, as opposed to evidence of actual harm to the child's emotional development, is insufficient to deny a natural [parent] the right to raise [their] own [child]." *Id*.

"Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent." *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.). "Other considerations may include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and an unstable, disorganized, and chaotic lifestyle that has put and will continue to put the child at risk." *Id*.

Additionally, "[t]he material time to consider is the present, and evidence of past conduct may not, by itself, be sufficient to show present unfitness." *Id*.; *see also Critz v. Critz*, 297 S.W.3d 464, 475 (Tex. App.—Fort Worth 2009, no pet.) ("Evidence of past misconduct is not alone sufficient to show present unfitness."). "While we are to determine the present fitness of a parent, we recognize that an adult's future conduct may be somewhat determined by recent past conduct." *De La Pena*, 999 S.W.2d at 528. However, "[i]f the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have

14

been a proper person to have such custody is not controlling." *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi-Edinburg 1992, writ denied); *see also C.O. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00453-CV, 2022 WL 413374, at *9 (Tex. App.—Austin Feb. 11, 2022, no pet.) (mem. op.) (concluding that "the evidence presented by the Department of Mother's misconduct—most of which occurred eighteen to twenty-six months before the conclusion of the final hearing—[was] factually insufficient to support the trial court's finding that appointment of Mother as managing conservator would significantly impair the children's physical health or emotional development.")

Finally, we recognize that when a parent and a nonparent are both seeking managing conservatorship, "close calls" in an evidentiary review should be decided in favor of the parent. *See Lewelling*, 796 S.W. 2d at 168; *In re J.C.*, 346 S.W.3d 189, 194 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *B.B.M.*, 291 S.W.3d at 469; *In re S.W.H.*, 72 S.W.3d 772, 778 (Tex. App.—Fort Worth 2002, no pet.); *In re M.W.*, 959 S.W.2d 661, 666 (Tex. App.—Tyler 1997, writ denied); *Ray v. Burns*, 832 S.W.2d 431, 434 (Tex. App.—Waco 1992, no writ); *see also R.H. v. D.A.*, No. 03-16-00442-CV, 2017 WL 875317, at *5 (Tex. App.—Austin Mar. 2, 2017, pet. dism'd) (mem. op.).

## DISCUSSION

With the above principles in mind, we now consider the evidence presented in this case, with the understanding that it was the Department's burden to affirmatively prove by a preponderance of the evidence that appointment of Mother and Father as managing conservators would "significantly impair" their children, either physically or emotionally. *See Lewelling*, 796 S.W.2d at 167. The Department presented undisputed evidence that Mother used marijuana while the case was pending and that Father, on at least one occasion while the case was pending,

used cocaine. Moreover, Mother and Father refused to take drug tests on numerous occasions, and it is well-established that a parent's failure or refusal to take drug tests supports an inference by the factfinder that the parent was using drugs. *See, e.g.*, *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied); *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.). The continued use of illegal drugs, particularly after a parent has been told by a court that they need to stop using illegal drugs to obtain the return of their children, is some evidence that a parent engaged in specific acts or omissions that demonstrate an award of custody to the parent would result in physical or emotional harm to the child. *See In re S.T.*, 508 S.W.3d at 497. Accordingly, we conclude that there was legally sufficient evidence to support the district court's finding that appointment of Mother and Father as joint managing conservators would significantly impair the children's physical health or emotional development.

On the other hand, we cannot conclude that the evidence in this case and on this record was factually sufficient to support the district court's finding, at least regarding Mother. We neither minimize the importance of complying with Department requests to take drug tests nor discount the evidentiary significance of the failure to take such tests. However, in this case, Mother's admitted marijuana use and failure to test was the only evidence the Department presented that would support the district court's finding that appointment of Mother as managing conservator would "significantly impair" the physical health or emotional development of her children. The Department did not present any direct evidence "linking" or connecting Mother's marijuana use with any actual or probable harm to her children. Although Mother tested positive for marijuana when the case began and two times while the case was pending, the Department never offered those drug test results into evidence, so the Department failed to show the amount

16

of marijuana that Mother used on the occasions when she tested positive. In fact, the Department presented no documentary evidence at all. The Department also failed to present any evidence that Mother used marijuana in a manner or under circumstances that harmed or threatened to harm the children in any way. Without such evidence, we cannot conclude that any danger to the children from Mother's marijuana use rises above mere "suspicion or speculation of possible harm." *See B.B.M.*, 291 S.W.3d at 467.

We reach the same conclusion regarding the allegations of domestic violence. Although caseworker Sosa testified that the Department was "concerned" about domestic violence between Mother and Father, the nature of those concerns was not explained, and the Department presented no evidence that any such domestic violence had occurred.[7] No documentary evidence regarding possible or actual domestic violence was admitted, and Sosa acknowledged that the Department had not received any referrals regarding domestic violence since the case began and that she was not aware of the police responding to any calls of domestic violence at the apartment. Without any evidence of domestic violence, we cannot conclude that any danger to the children from such violence rises above mere "suspicion or speculation of possible harm." *See id*.

Additionally, other than the missed drug tests (which we again emphasize was a serious matter as reflected in the district court's expression of concern), Mother completed most of her court-ordered services, including individual therapy, parenting classes, the psychiatric evaluation, and a 60-hour Intensive Outpatient Program (IOP). She did not complete couples' counseling, but the Department presented no evidence as to why this service was necessary to the

---

[7] There were allegations in the removal affidavit suggesting possible domestic violence, but again, the removal affidavit was not admitted into evidence and we thus cannot consider it. *See Tschirhart*, 876 S.W.2d at 508–09.

17

physical or emotional health of the children, particularly in the absence of any evidence of domestic violence between Mother and Father. Moreover, at the time of trial, Mother was employed and had stable housing. Sosa had visited the home in the month before trial and recounted that it was a "very clean" two-bedroom apartment with a living room, and she "didn't see any visible safety hazards when [she] was there." CASA had not received any information that the boys were ever unsafe in Mother's care, and Sosa testified that the children love and "feel safe with their parents."

Finally, we observe that this case began not because Mother or Father were suspected of abuse or neglect of the children but because Mother reported that her youngest child might have been sexually abused by the child's uncle. Mother made this report despite receiving strong opposition from her family. As the district court observed, this was "commendable" behavior by Mother and is "what we want parents to do." Mother's action in reporting the possible abuse of her child is strong evidence contrary to the district court's finding that appointment of Mother as managing conservator would not be in the children's best interest because doing so would significantly impair the children's physical health or emotional development.

In sum, the Department failed to present any direct evidence linking Mother's admitted marijuana use to any actual or probable harm to her children and further failed to present any evidence of domestic violence between Mother and Father. The Department also failed to present any documentary evidence at all in the case, including the removal affidavit, and failed to present any testimony by Maternal Grandmother, the person who the Department had sought to be appointed permanent managing conservator of the children. On the other hand, Mother presented evidence that she had completed many of her court-ordered services, had taken

steps to achieve stability, including by finding employment and stable housing, and had acted as a protective mother by reporting the possible abuse of her youngest child. On this record, we conclude that the evidence supporting the district court's finding that appointment of Mother as managing conservator would not be in the children's best interest because doing so would significantly impair the children's physical health or emotional development, although legally sufficient, is factually insufficient in that it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See In re S.T.*, 508 S.W.3d at 498; *In re B.B.M.*, 291 S.W.3d at 471; *see also T.E. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00067-CV, 2022 WL 3092885, at *9-10 (Tex. App.—Austin Aug. 4, 2022, no pet.) (mem. op.); *C.O.,* 2022 WL 413374, at *9. Therefore, the district court's decision to appoint Maternal Grandmother as the children's permanent managing conservator rather than at least one of their natural parents was unreasonable and constitutes an abuse of discretion.

We sustain Mother's sole issue on appeal. Because we are reversing the district court's order appointing Maternal Grandmother as the permanent managing conservator of the children and remanding for an entirely new trial, we need not consider Father's issue on appeal.[8] *See* Tex. R. App. P. 47.1.

---

[8] On remand, if the Department seeks to have a nonparent appointed a managing conservator of the children, the Department will again be required to overcome the parental presumption as to both Mother and Father. *See Critz v. Critz*, 297 S.W.3d 464, 471 (Tex. App.—Fort Worth 2009, no pet.) ("Under section 153.131 . . . a non-parent may not be appointed a joint managing conservator without overcoming the presumption as to *both* parents); *see also* Tex. Fam. Code 263.404(a).

19

**CONCLUSION**

We reverse the district court's decree of conservatorship and remand the case to the district court for a new trial. Because this suit was tried as a child-protection case, the new trial must be commenced within 180 days of this Court's mandate. *See* Tex. R. App. P. 28.4(c). On remand, the district court should consider the children's and parties' circumstances at that time. *See Shook v. Gray*, 381 S.W.3d 540, 542–43 (Tex. 2012) (explaining that "trial court must be able to consider the changed circumstances" in its determination of conservatorship on remand).

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Kelly

Reversed and Remanded

Filed: February 28, 2023